UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALEXIS H., : | |
| : | |
| *Plaintiff*, : | |
| : | |
| v. : | No. 3:22-cv-1460 (SDV) |
| : | |
| COMMISSIONER OF SOCIAL : | |
| SECURITY, : | |
| : | |
| *Defendant*. : | |

### RULING ON PENDING MOTIONS

Plaintiff brings this administrative appeal from the decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits and supplemental security income. For the reasons below, plaintiff's Motion to Reverse the Decision of the Commissioner, ECF 14, is DENIED, and the Commissioner's Motion to Affirm, ECF 19, is GRANTED.

### A. LEGAL STANDARDS

#### 1. Disability and eligibility

A claimant is disabled under the Social Security Act if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for Title II disability insurance benefits, the claimant must establish the onset of disability during the period in which he or she was insured for disability benefits based on quarters of qualifying work. 42 U.S.C. § 423; *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). Alternatively, Title XVI provides for supplemental security income benefits to

claimants who are indigent and disabled without reference to prior work dates. *See Bowen v. City of New York*, 476 U.S. 467, 470 (1986) (citing 42 U.S.C. § 1381 *et seq.*).

### 2. Commissioner's five-step review

The Commissioner of Social Security is authorized to make findings of fact and decisions on disability applications, *see* 42 U.S.C. §§ 405(b)(1), 1383(c)(1)(A), in accordance with the five-step sequential evaluation process provided in 20 C.F.R. §§ 404.1520, 416.920. (1) First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. (2) If not, the Commissioner determines whether the claimant has a medically determinable impairment or combination of impairments that are "severe," meaning that it "significantly limits" the claimant's physical or mental ability to do basic work activities. (3) If the claimant has a severe impairment or combination of impairments, the Commissioner evaluates whether, based solely on the medical evidence, the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1, Subpart P, No. 4 of the regulations (the "Listings") and that either is expected to result in death or has lasted or will last for at least 12 months. [1] If so, the claimant is disabled. (4) If not, the Commissioner determines whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his or her past work. [2] (5) If not, the Commissioner determines whether there is other work in the national economy which the claimant can perform in light of his or her RFC, age, education, and work experience. *See* 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the

---

[1] *See* 20 C.F.R. §§ 404.1509, 416.909 (durational requirement).

[2] Residual functional capacity is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. §§ 404.1545, 416.945.

burden of proof on the first four steps, and the Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

The Commissioner's authority to make these findings and decisions is delegated to an administrative law judge ("ALJ").  *See* 20 C.F.R. §§ 404.929, 416.1429.  A claimant may request review of an ALJ's decision by the Appeals Council.  *See* 20 C.F.R. §§ 404.967, 416.1467.  If the Appeals Council declines review or affirms the ALJ's decision, the claimant may appeal to the United States District Court.  42 U.S.C § 405(g).

### 3. Court's review on appeal

A district court reviewing the Commissioner's final decision is performing an appellate function, *see Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981), and has the power to affirm, modify, or reverse the Commissioner's decision based on its review of the briefs and the administrative record.  *See* 42 U.S.C § 405(g).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B. BACKGROUND

### 1. Procedural History

In June 2020, plaintiff filed applications for disability insurance benefits and supplemental security income alleging a disability onset date of December 2, 2019.  R. 278-85.  The claim was denied at the initial and reconsideration levels, and plaintiff requested a hearing.  R. 141, 147, 153-54, 161.  On August 9, 2021, ALJ Matthew Kuperstein conducted a telephonic hearing at which plaintiff and a vocational expert testified.  R. 35-98.  On September 21, 2021, the ALJ issued a written decision denying plaintiff's claim.  R. 17-28.  Plaintiff's request for

review was denied by the Appeals Council, R. 1-5, and plaintiff filed this action on November 15, 2022.

### 2. Factual History

#### a. Alleged conditions

In his July 2020 application, plaintiff listed his impairments as heart problem, brain aneurysm, migraines, hand/wrist/arm problem, high blood pressure, and high cholesterol. R. 279. In an August 2020 function report, plaintiff complained of confusion due to constant headaches with left eye aura. R. 340. He also identified intermittent arm, chest, neck, and jaw pain that increases with movement as well as light sensitivity and nausea. *Id.* He stated that the pain lasts anywhere from five minutes to five days and often disrupts his sleep. R. 344. At the August 2021 hearing, plaintiff's counsel summarized his conditions as subclavian steal syndrome resulting in decreased growth and muscularization of his left arm, chest discomfort, dizziness, pre-syncope, and headaches which include migraines. R. 44. Plaintiff also testified that he has a detached left retina that affected his vision. R. 46, 49.

#### b. Treatment history

Plaintiff's treatment record is significant for cardiovascular issues and migraine headaches. He has a prior history of congenital coarctation (narrowing) of the aorta, ligation of the left subclavian artery, and aortic valve replacement. R. 2480. Following a 2005 valve replacement, he reported headaches, dizziness, chest pain, and left arm pain that were always preceded by exertion and persisted and increased over time. R. 2481. After diagnosis of subclavian steal (retrograde flow) syndrome, he underwent a left carotid axillary bypass in July 2018. R. 2480. In February 2019, the surgeon noted that "[h]is symptoms have remarkably improved, however, he does have severe headaches and some left sided facial congestion." R.

1708. An ultrasound revealed elevated velocities in the bypass graft suggesting possible stenosis of the carotid artery. R. 1707, 1710. However, an angiogram that month temporarily resolved his symptoms, as reported during a follow-up in May 2019. R. 1733.

In July 2019, he complained again of left arm pain, tingling and weakness, as well as headaches and chest pain, similar to his symptoms before but not as severe. R. 1737. He also complained to neurologist Caitlin Loomis, MD of depression, memory loss, anxiety, and insomnia. R. 1743. He reported being forgetful, for example, not remembering how to fix a refrigerator in his repairman job. R. 1742. Another angiogram that month showed no physical change: the bypass remained open with unchanged left vertebral occlusion. R. 1768. He continued to complain of left arm pain throughout the latter half of 2019. R. 1787, 1797.

In May 2020, plaintiff reported worsening headaches to Dr. Loomis, who noted that they were two distinct kinds: migraines, which plaintiff had experienced since childhood, occurring 2 to 3 times per week, and left-sided pain triggered by physical activity that moved down the left side of his jaw, neck, shoulder, down into his chest and rib area. R. 1804. He was not sleeping well. R. 1805. Dr. Loomis prescribed nortriptyline. R. 1807-08. In June 2020 he reported worsening migraine headaches, chest pressure, left arm, and jaw pain/claudication. R. 1814. However, a cardiac catheterization in July 2020 showed no significant coronary artery disease in the left dominant system, with only mild disease in the proximal left common carotid to left subclavian artery bypass graft which remained patent, i.e. unobstructed, with brisk flow. R. 1838. Dr. Loomis recommended increasing nortriptyline and referral to a headache specialist. R. 1854.

In July 2020, Dr. Loomis entered a referral for plaintiff to consult with a headache specialist. R. 1847. In August 2020, he reported daily migraine headaches with little relief, R.

1854, although he also said that nortriptyline improved, but did not completely resolve, his headaches, R. 1857. Dr. Loomis offered to prescribe a Medrol dose pack but plaintiff declined "for now." As for vascular issues, a CT scan that month showed mild focal stenosis in the bypass graft but it was overall patent. R. 1883. In September 2020, a duplex ultrasound confirmed there was no evidence of stenosis of the graft itself. R. 1865. Plaintiff complained of arm pain and vertigo, and Dr. Loomis suspected recurring subclavian steal and referred him to physical therapy. R. 1884. Plaintiff also complained again of cognitive issues, namely, forgetting what he wants to say in the middle of conversations. R. 1881. He reported sleeping 6 to 7 hours per night. *Id.* Dr. Loomis suspected that his memory complaints were due to mood disturbance, inadequate sleep, and chronic pain. R. 1884. She recommended over-the-counter melatonin as a sleep aid as well as magnesium and ordered laboratory testing of plaintiff's thyroid-stimulating hormone and B12 blood levels, *id.*, which returned normal results, R. 1889-90. In his October 2020 visit with Dr. Loomis, she noted the TSH and B12 results but did not add any comment regarding plaintiff's memory or cognitive status. R. 1915. She did note that an EMG the prior month was reassuring in that it showed no brachial plexopathy or cervical stenosis. *Id.* She also noted that although the EMG showed some indication of bilateral median and ulnar neuropathies, plaintiff was not experiencing related symptoms. *Id.*

In October 2020, plaintiff began treating with headache specialist Nicholas Tzikas, MD, who recommended Botox and some potential medications. R. 1908. Botox treatment began in November 2020 and resulted in improvement by February 2021 from almost daily headaches prior to Botox to 2 to 3 times per week thereafter. R. 1939. Plaintiff made a primary care appointment in April 2021 to complain of worsening migraines with minimal relief after a Botox injection a few weeks prior. R. 1984. The provider noted that his oral therapy options were

6

limited given the potential for interactions with his heart medications, and advised plaintiff to follow up with his headache specialist. R. 1985. At a subsequent Botox appointment in May 2021, plaintiff reported that the improvement in headaches – from once daily to about twelve times per month – was holding steady, although he rated the pain severity as 8/10. R. 1954.

In the most recent relevant note, in June 2021, plaintiff transitioned from Dr. Loomis to a new neurologist, who conducted a physical examination that showed only mild loss of strength on plaintiff's left side, and also recorded that plaintiff "has headache that lasted few minutes." R. 1970.

### c. Plaintiff's statements

Plaintiff testified as follows at the August 2021 hearing. He was 41 years old on the hearing date and has a ninth-grade level of education. R. 37, 87. Plaintiff testified his migraine headaches last anywhere between two hours and two days. R. 48. Sitting down helps but does not eliminate headaches or associated symptoms. R. 49. He has fallen when trying to climb stairs during a migraine. R. 60. Plaintiff receives Botox treatments and Nurtec medication for migraines. R. 44. Nurtec helps "a little bit" but "the migraine and nauseousness comes right back" after about six hours. R. 48. The migraines have improved over the course of five Botox treatments. R. 55-56. However, they have not been eliminated, and he has been told by doctors that he is not a candidate for other treatments due to his heart condition. R. 56.

Plaintiff's other primary complaint is pain in his left side and arm that comes and goes and is associated with shortness of breath. R 48-52. He described his left arm as significantly smaller than his right arm. R. 63. He is a "pretty strong guy," but lifting even a pen or a paperclip with his left arm can cause sharp pain pains that last between two seconds and five minutes. R. 51-53. Plaintiff also has difficulty performing yard work. R. 51. He can only walk

7

about the length of three houses before needing to take a break. R. 59. Although he can drive, he often has his wife drive him around because he does not know when his symptoms might come on. R. 53. On "bad days," he cannot even lift five pounds and has trouble folding laundry. R. 52-53. He can type on a computer keyboard on a good day, but otherwise it would be difficult beyond single key stroke actions. R. 56-58. "Good days" occur about three or four times per month. R. 61. Plaintiff had surgery that temporarily made him stronger and provided relief. R. 63-64. However, the pain and headaches returned. *Id.*

Plaintiff also testified that due to a scar on his back from a cyst removal he cannot sit for thirty minutes without having to stand up or lay on his side. R. 51.

**3. The ALJ's Decision**

In the September 21, 2021 decision, the ALJ followed the five-step sequential evaluation process to determine whether plaintiff was disabled under the Social Security Act. At Step 1, the ALJ found that plaintiff did not engage in any substantial gainful activity after the alleged onset date. R. 20. At Step 2, the ALJ found that plaintiff has the following severe impairments: obesity, non-obstructive coronary artery disease with history of subclavian steal syndrome and status post repair of it, history of hypertension, detached left retina, central serous retinopathy in the left eye, and migraine headaches. R. 20-21. The ALJ also considered problems related to plaintiff's left upper extremity but found that these were symptoms of the subclavian steal syndrome rather than independent impairments. [3] R. 21. At Step 3, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. *Id.*

---

[3] The ALJ also found that high cholesterol was not a severe impairment and that any impairment related to the possibility of aneurism was not medically determinable because it was not established in the record using medically acceptable diagnostic techniques. R. 20.

8

Next, the ALJ determined that plaintiff retains the following RFC:

> [T]o perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: To lifting or carrying 20 pounds occasionally and 10 pounds frequently; To standing or walking with normal breaks for a total of six hours in an eight hour workday; To sitting with normal breaks for a total of six hours in an eight hour workday; To only occasional climbing of ramps or stairs; To never climbing of ladders, ropes, or scaffolds; To no exposure to hazards such as heights or machinery.

*Id.* At Step 4, the ALJ found plaintiff unable to perform any past relevant work. R. 21-26. At Step 5, based on the vocational expert's testimony, the ALJ found that jobs exist in significant numbers in the national economy that plaintiff can perform in light of his RFC, and so was not disabled within the meaning of the Social Security Act from the onset date of December 2, 2019 to the date of the September 21, 2021 decision.

### C. DISCUSSION

Plaintiff raises two claims of error. *First*, he contends that the ALJ's RFC determination is not supported by substantial evidence. Pl. Br., ECF 14-1, at 2. Specifically, plaintiff argues that the ALJ (a) ignored plaintiff's memory problems and (b) misinterpreted the record regarding plaintiff's migraine headaches. *Second*, plaintiff contends that the ALJ failed to properly evaluate an opinion from occupational therapist Jaclyn Bria. *Id.* at 7. The Court addresses each in turn.

#### 1. Substantial evidence supports the ALJ's RFC assessment.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). It must be "more than a mere scintilla or touch of proof here and there in the record." *Id.* If the Commissioner's decision is supported by substantial evidence, that decision will be sustained,

9

even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

In making his RFC determination, the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but also found that plaintiff's statements concerning the intensity, persistence and limiting effects were not entirely consistent with the medical evidence and other evidence. R. 22. Regarding plaintiff's cardiovascular conditions, the ALJ was persuaded by objective medical evidence, particularly a June 2020 catheterization visually demonstrating that the arterial bypass graft remained open as well as a CT scan and ultrasound in August and September 2020 showing that the graft was patent with no more than mild stenosis. *Id.* Regarding plaintiff's allegation of atrophy and weakness in his left arm, the ALJ noted that the left arm had been catching up over the relevant period in radial pulse and size, and that plaintiff had regained normal and symmetrical strength and no sensory deficits. [4] R. 23. The ALJ further noted that although the September 2020 EMG showed mild to moderate entrapment neuropathy in the left upper arm, physical examinations showed symmetric finger tapping, no tremor, and intact rapid hand movements. R. 24. Taking all this into account, the ALJ concluded that plaintiff had no more than mild strength deficit in his left upper arm. *Id.*

Regarding headaches, the ALJ noted that plaintiff had experienced migraines for more than 33 years but did not obtain specialty treatment from a neurologist until October 2020. R. 24. At the next appointment in January 2021, plaintiff reported improvement with a reduction in

---

[4] The ALJ cited two detailed physical examinations from July 2019 and October 2020 showing symmetrical upper extremity strength with only mild deficit in the left triceps. *Id.*; *see also* R. 1907, 2376. The ALJ also cited a series of primary care records without indication of strength abnormalities. R. 23.

both frequency and duration of headaches. *Id.* The ALJ did recognize that plaintiff made a primary care appointment in April 2021 to complain of worsening migraines with and was referred to his neurologist. *Id.* Nonetheless, the ALJ noted that the migraines were categorized as not intractable throughout the relevant period and that there was overall improvement. *Id.* The ALJ therefore concluded that the only relevant functional limitations were restriction to no climbing and no exposure to hazards. *Id.*

In the RFC determination, the ALJ also addressed vision issues, which are not relevant to plaintiff's claim of error. Notably, the ALJ did not address plaintiff's reported memory problems at any point in the written decision.

### a. Omission of memory complaints was not error

Plaintiff first argues that because the ALJ did not discuss his complaints of memory troubles and forgetfulness, the RFC determination was not supported by substantial evidence. Pl. Br., 14-1 at 4-5. The threshold problem with this argument is that plaintiff alleged disability based entirely on his physical conditions throughout these proceedings, and therefore waived judicial review of this untimely assertion of a mental impairment. Of course, "[a]n ALJ is required to 'investigate the disabling effects of an impairment if the record contains evidence indicating that such an impairment might exist,' even where a Plaintiff did not list that impairment on his or her disability application." *Beliana M. C. v. Comm'r of Soc. Sec.*, No. 3:21-cv-464 (SALM), 2022 WL 596045, at *7 (D. Conn. Feb. 28, 2022) (quoting *Rodriguez v. Barnhart*, No. 05-cv-3383 (SAS), 2006 WL 988201, *4 (S.D.N.Y. Apr. 13, 2006)). However, judicial review is waived where neither the claimant nor his counsel alleged any putative mental impairment as a basis for disability at any point during the administrative proceedings, not even

11

indirectly. [5]  *See Guzman v. Berryhill*, No. 15-cv-3920 (VB)(LMS), 2018 WL 3387319, at *21 (S.D.N.Y. June 12, 2018) (collecting cases), *report and recommendation adopted*, 2018 WL 3384444 (S.D.N.Y. July 11, 2018); *accord. Zipporah M. v. Comm'r of Soc. Sec.*, No. 6:20-cv-1333 (DJS), 2022 WL 1115629, at *3 (N.D.N.Y. Apr. 14, 2022).

Moreover, even if plaintiff were entitled to review of this argument, it would be unavailing.  The ALJ was not required to discuss the memory complaints because plaintiff neither asserted any mental impairment nor submitted evidence of diagnosis or treatment of mental impairment that would necessitate further investigation.  *See* 20 C.F.R. §§ 404.1512, 416.912 ("We will consider only impairment(s) you say you have or about which we receive evidence.").  Here, Dr. Loomis noted plaintiff's complaint of forgetfulness in July 2019.  R. 1742.  She noted it again in September 2020, and suspected that the cause might be mood disturbance, inadequate sleep, and chronic pain.  R. 1884.  She recommended over-the-counter magnesium along with melatonin for sleep.  *Id.*  She also ordered testing of plaintiff's thyroid-stimulating hormone and B12 levels, which returned normal results.  R. 1889-90.  In plaintiff's next visit with Dr. Loomis in October 2020, she noted those results and made no further comment on his memory complaints.  R. 1915.  In a physical examination conducted on January 7, 2021, Dr. Tzikas noted that both remote and recent memory were "intact," R. 1938, and plaintiff did not complain of any memory-related issues during this examination.  R. 1935-39.  In the most recent relevant visit with his new neurologist in June 2021, plaintiff again did not complain of any memory-related deficits and the record of this visit describes plaintiff's memory

---

[5] Plaintiff did make an anecdotal reference to bad memory in his hearing testimony. Specifically, when asked what he was doing the last time he fell down, he could not recall and apologized that "my memory is not the greatest all the time."  R. 60.  This passing remark was insufficient to raise the issue of a potential mental impairment.

and cognition as "normal." R. 1971. In sum, the record indicates that this was a passing concern that was insufficient to require investigation or discussion of a potential mental impairment. *See*, *e.g.*, *Martinez v. Colvin*, 286 F. Supp. 3d 539, 543 (W.D.N.Y. 2017) (ALJ was not required to develop record on claimant's intellectual capacity where plaintiff never claimed intellectual impairment and none was diagnosed); *Herrera v. Colvin*, No. 14-cv-7802 (RWS), 2016 WL 1298990, at *7 (S.D.N.Y. Mar. 31, 2016) (ALJ not required to investigate or discuss plaintiff's passing complaint of depression where claimant never alleged it as a basis for disability and was not treated for it); *Piatt v. Colvin*, No. 13-cv-6436 (EAW), 2015 WL 274180, *9-10 (W.D.N.Y. 2015) (where medical record included only a passing suspicion of carpal tunnel or restless leg syndrome with no diagnosis or treatment, ALJ was not required to address it). Moreover, this evidence would not be sufficient to establish the existence of a medically determinable impairment, and consequently would not have to be considered in the RFC determination in any event. *See*, *e.g.*, *Piatt* at *10. ("Even if it was an error for the ALJ to neglect to specifically mention Plaintiff's complaints of carpal tunnel or restless leg syndrome in her decision, such an error would be harmless in light of the fact that the record does not show these alleged ailments as medically determinable impairments."). For all these reasons, there is no error regarding plaintiff's memory complaints.

### b. ALJ did not misinterpret evidence concerning headaches

Plaintiff next alleges that the ALJ's RFC discussion included two factual errors or omissions relating to plaintiff's headaches. First, plaintiff disputes the accuracy of the ALJ's statement that plaintiff "did not seek specialty treatment with a neurologist until October 2020," *see* R. 24, and notes that he had been treating since at least July 2019 with Dr. Loomis, a board-certified neurologist. Pl. Br., 14-1 at 5. However, the Court does not read the ALJ's statement to

13

suggest that plaintiff did not treat with *any* neurologist until October 2020. In fact, the ALJ demonstrated his familiarity with Dr. Loomis's records. *See* R. 25. Instead, the ALJ was pointing to the fact that Dr. Loomis referred plaintiff to a "headache specialist" in July 2020 and noted that she would "defer to [the] headache specialist" on the question of Botox or other interventions. R. 1847. Plaintiff then began treatment with Dr. Tzikas in October 2020. R. 1903-09. Plaintiff's brief concedes that Dr. Tzikas has "expertise in medical and interventional management of headache." ECF 14-1 at 25. Accordingly, the ALJ was not mistaken in observing that plaintiff's treatment with a headache specialist did not begin until October 2020.

Second, plaintiff contends that the ALJ's observation that his headaches had improved after specialty treatment is inaccurate and incomplete because he reported "worsening migraines" in April 2021 even after Botox, R. 1984, and although he was no longer experiencing daily headaches, he still reported about 12 headaches per month in February and May 2021 with reported pain severity of 8/10, R. 1939, 1954. *See* Pl. Br., ECF 14-1 at 6-7. However, the ALJ did acknowledge the April 2021 complaint and nonetheless concluded that the improvement was sufficient to neutralize any functional limitations other than no climbing and no exposure to hazards. R. 24. It was not unreasonable for the ALJ to reach this conclusion, given the evidence that plaintiff's longstanding problem with headaches, which could be relieved by taking medication (i.e., were not intractable), had improved significantly since the commencement of treatment with Dr. Tzikas. R. 1903-09, 1935-39. In fact, at his initial visit with Dr. Tzikas on October 1, 2020, plaintiff indicated that he had severe migraines once every 4 to 8 weeks depending on triggers and daily mild to moderate headaches since December 2019, lasting for minutes to hours. R. 1903. By January 7, 2021, following the medication regimen instituted by Dr. Tzikas, plaintiff reported he "feels an improvement in his overall headache condition

endorsing a reduction in migraine frequency and duration," stated that he "does not have migraines lasting several days anymore," and described having approximately one or two migraines per week and intermittent mild daily headaches.  R. 1935.  At a Botox injection in February 2021, plaintiff reported a reduction in headaches "from almost daily prior to Botox to 2-3 times / week which is 12 headaches per month."  R. 1939.  At the subsequent Botox injection in May 2021 at which Dr. Tzikas was present, the corresponding note does not suggest any regression in plaintiff's condition, noting only the same frequency of "about 12 headaches a month" that plaintiff had reported in February 2021.  R. 1954.  At plaintiff's intake appointment with his new neurologist in June 2021, which is the most recent relevant note, headaches were not a point of emphasis.  In fact, after a detailed physical examination, the new neurologist noted only that plaintiff "also has headache that lasted few minutes." [6]  R. 1970.  Although the evidence of twelve headaches per month arguably could support a finding of greater functional limitations, the ALJ's conclusion is not patently unreasonable based on the overall record.  *See Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*.") (emphasis retained; citation and quotation marks omitted); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").  In sum, plaintiff has not identified any reversible factual error in the ALJ's RFC analysis relating to headaches.

---

[6] It is unclear whether the June 2021 note stating that plaintiff "also has headache that lasted few minutes" refers to a particular headache or how his headaches were generally manifesting at that point in time.  Regardless, it is indicative of overall improvement consistent with records from the prior months.

### 2. OTR's treatment note was not a medical opinion

Plaintiff's final argument is that the record included a medical opinion from registered occupational therapist ("OTR") Jaclyn Bria that the ALJ should have evaluated pursuant to 20 C.F.R. §§ 404.1520c and 416.920c. Pl. Br., ECF 14-1 at 8-9. "Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles." *Russ v. Commissioner*, 582 F. Supp. 3d 151, 157-58 (S.D.N.Y. 2022) (citing examples). "Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations removed).

The regulations define "medical opinion" as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the abilities to "perform physical demands . . . or other physical functions;" "perform mental demands" including "maintaining concentration, persistence, or pace;" "perform other demands of work, such as seeing, hearing, or using other senses; and "to adapt to environmental conditions[.]" 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2). Plaintiff is correct that an OTR may be a "medical source" who can render a medical opinion. *See* 20 C.F.R. §§ 404.1502(d), 416.902(i) ("Medical source means an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law[.]"); *see also*, *e.g.*, *Marita K. v. Comm'r of Soc. Sec.*, No. 21-cv-592-MJR, 2023 WL 5368494, at *4 (W.D.N.Y. Aug. 22, 2023) (remanding where ALJ failed to articulate evaluation of OTR's opinion). However, the treatment note that plaintiff cites does not qualify as a medical opinion within the regulatory definition.

OTR Bria saw plaintiff four times between September 8 and October 20, 2020 on referral from Dr. Loomis.  R. 1878, 1887, 1911, 1919.  The goal of the occupational therapy was "to reduce anterior thorax tightness and improve posterior chain activation for better positioning and to increase flow of critical structures."  R. 1878.  Bria noted that plaintiff was "anxious with mobility" and "has difficulty with exercise due to anxiety of pain."  R. 1878, 1911.  The language cited in plaintiff's brief appears in the last progress note dated October 20, 2020 in which OTR Bria noted: "Alexis appears fearful of motion.  Worked on controlled breathing during exercise, recommend patient inquire about mental health counseling due to emotional difficulties.  Patient will benefit from reviewing paced activities to reduce stress."  R. 1919.

In a strained reading, plaintiff argues that OTR Bria's suggestion to review "paced activities" is consistent with plaintiff's complaints of forgetfulness and therefore constitutes a medical opinion as to mental functional limitations.  Pl. Br., ECF 14-1 at 9.  Plaintiff appears to be conflating Bria's use of the term "paced activities" with the ability to "concentrate, persist, or maintain pace" as used in regulations that govern evaluation of mental impairments.  *See* 20 C.F.R. §§ 404.1520a, 416.920a.  However, she clearly was using the word "paced" to denote a therapeutic approach aimed at expanding plaintiff's physical activities, rather than as a signifier of some mental impairment or mental limitation that plaintiff could not overcome.  In other words, Bria was not rendering an opinion "about what [plaintiff] can still do despite [his] impairment(s) and whether [he has] one or more impairment-related limitations or restrictions."  20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  Consequently, the statement was not a medical opinion but was more in the nature of a treatment note and recommendation, and the ALJ was not obliged to evaluate it under 20 C.F.R. §§ 404.1520c and 416.920c.  There is no error in this regard.

**D. CONCLUSION**

For the reasons set forth above, plaintiff's Motion to Reverse the Decision of the Commissioner, ECF 14, is DENIED, and the Commissioner's Motion to Affirm, ECF 19, is GRANTED.

This is not a recommended ruling. The consent of the parties allows a magistrate judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

SO ORDERED, this 3rd day of January, 2024, at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge